154 A.2d 188 (1959)
Gino TREVES, Peter G. Treves, Susan Brockman, Samuel I. Posen, Hugo Bauer, James J. Duane, Jr., and Margaret W. Duane, doing business under the firm name and style of James J. Duane & Co., and Thomas B. Hand, Plaintiffs Below, Appellants,
v.
SERVEL, INC., a Delaware corporation, Duncan C. Menzies, J. Patrick Lannan, Hunter S. Marston, Henry Necarsulmer, H. Irving Pratt, W. F. Rockwell, Jr., Louis Ruthenburg, A. Lightfoot Walker and John H. Wall, Defendants Below, Appellees.
No. 6, 1959.
Supreme Court of Delaware.
July 13, 1959.
*189 Irving Morris, of Cohen & Morris, Wilmington, for appellants. Milton S. Gould, of Gallop, Climenko & Gould, New York City, and Benedict Wolf, of Wolf, Popper, Ross, Wolf & Jones, New York City, of counsel.
Aaron Finger, of Richards, Layton & Finger, Wilmington, for Servel, Inc.
SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.
WOLCOTT, Justice.
This is an appeal from a portion of an order of the Vice-Chancellor awarding out-of-pocket expenses and counsel fees to plaintiffs' attorneys in the amount of $2500.
The action was a class action brought by certain preferred stockholders of Servel, Inc., to compel payment of dividend arrearages on Servel's preferred stock and compliance with sinking fund provisions of its charter for the annual retirement of a certain number of shares of preferred stock or, in the alternative, to compel the redemption by Servel of all of its outstanding preferred stock and the payment of cumulated dividend arrearages.
Servel for years was engaged in the business of manufacturing refrigeration equipment. During the Korean War it engaged extensively in defense manufacture and, following that war, an unfavorable trend in its business affairs developed which ultimately led the Board of Directors to conclude to withdraw from the refrigeration field and enter a different type of business activity. Servel, when its operations commenced to show annual losses, suspended payment of the cumulative preferred dividends and compliance with the charter sinking fund provision for the annual retirement of preferred stock.
Servel's refrigeration business following the Korean War resulted in the accumulation of a tax loss carry-forward of $18,300,000 which, under existing Income Tax Laws, could be deducted through the fiscal year 1961 from annual earnings if there were such. Accordingly, in the judgment of Servel's directors, it was in the best interest of Servel to liquidate Servel's then assets and to use the proceeds of such liquidation to acquire a profitable business which would enable Servel to utilize its tax loss carry-forward and thus increase the net profit after taxes of such new business.
Thus, in the late summer of 1957 Servel's management decided to seek its stockholders' approval for the selling of Servel's assets and the acquisition of another type of business.
A special meeting of stockholders was called for September 11, 1957. At that meeting the stockholders ratified and approved the directors' proposal that the assets of Servel be sold within a specified time at and above a specified minimum price. At the stockholders meeting 74% of the preferred stock was represented, of which 99% approved the directors' proposal.
In the proxy statement issued in connection with the special stockholders meeting, Servel's management proposed that the proceeds of sale of the Servel assets be used by Servel's management to acquire a new business with a demonstrated earning capacity. It was also stated that when Servel again had earnings it was proposed to resume payments to the preferred stockholders.
Upon ratification by the stockholders of the plan, Servel proceeded to sell its assets *190 The sale resulted in liquid assets to Servel of approximately $17,000,000. Thereupon, Servel's management commenced to negotiate for the acquisition by Servel of a new business.
On March 3, 1958 two of the present appellants, preferred stockholders of Servel, instituted Civil Action No. 950 in the Court of Chancery. The action sought to compel the payment of preferred stock arrearages. It was alleged that prior to the sale of its assets Servel had operated its business at a loss; that no dividends had been paid on the preferred stock in 1955, 1956 and 1957; that Servel had retired no preferred stock during said years in accordance with the sinking fund provision of its charter; that plaintiffs had demanded the redemption by Servel of all of its preferred stock; but that Servel's management had refused to comply, taking the position that no dividends would be paid on the preferred stock until the earnings of the company justified the payment, even though Servel had in hand cash realized from its sale of assets many times in excess of the amount required to pay the preferred stock arrearages.
Civil Action No. 950 was dismissed on Servel's motion on the ground that the management's decision was a proper exercise of business judgment under the circumstances. Treves v. Menzies, Del.Ch., 142 A.2d 520. The Vice-Chancellor's opinion was filed July 11, 1958 and a final order entered on August 12, 1958. The plaintiffs in No. 950 thereupon, on August 25, 1958, appealed to this court.
On November 17, 1958, a date prior to the due date of the appellees' brief in the appeal in Civil Action No. 950, the present action, Civil Action No. 1071 was instituted against Servel by preferred stockholders of Servel, some of whom had been plaintiffs in Civil Action No. 950. No. 1071 asserts substantially the same cause of action dismissed by the Vice-Chancellor in No. 950.
On December 1, 1958, the parties in No. 1071 entered into a stipulation of settlement providing that, upon the acquisition of a new business by Servel or not later than March 10, 1959, Servel would take care of the dividend and sinking fund arrearages on its preferred stock and, upon either event, the plaintiffs would dismiss the appeal in No. 950 and join with Servel in an application for the dismissal of No. 1071 with prejudice.
As a part of the settlement agreement, Servel agreed to pay reasonable counsel fees to plaintiffs' counsel for their services in both No. 950 and No. 1071, "the amount of such fees and the manner of payment" to be determined by the court.
The Vice-Chancellor ordered the stipulation of settlement set down for hearing. At the hearing Servel appeared in opposition to the allowance of any fees to plaintiffs' counsel, as did also two preferred stockholders owning jointly a substantial number of preferred shares. The Vice-Chancellor approved the settlement, and allowed a fee of $2500 to plaintiffs' counsel who had requested the allowance to them of $200,000. From this allowance plaintiffs now appeal, arguing that the allowance is grossly insufficient.
On the briefs and at the argument plaintiffs' counsel argue that the sole matter before the Vice-Chancellor, assuming his approval of the settlement agreement, was the fixing of an amount to be paid plaintiffs' counsel based upon their time and services rendered in both Nos. 950 and 1071. They argue that Servel violated the terms of the settlement in opposing the award of any fee to them, since it had expressly agreed to pay any fees allowed. We think, however, that the stipulation did not bind Servel not to oppose the allowance of any fee but merely to pay whatever was charged against it. This, presumably, Servel still stands ready to do.
We think the only question with which we are concerned, therefore, is the propriety under the circumstances of the award by the Vice-Chancellor of a purely *191 nominal sum as fees, for we agree with the plaintiffs that the fee awarded is properly labeled as nominal in view of the proof of the hours of time and effort spent by plaintiffs' attorneys.
Since this is a class action in which allowance to counsel is to be fixed in such amount as the Vice-Chancellor shall think proper, it is axiomatic that such an application is addressed to the discretion of the Vice-Chancellor and is to be determined by him by the exercise of his sound judicial discretion in the light of all the circumstances. Aaron v. Parsons, Del., 144 A.2d 155 and Cf. Everitt v. Everitt, Del., 146 A.2d 388 and Veeder v. Public Service Holding Corp., 31 Del.Ch. 499, 70 A.2d 22. Under such circumstances, our power of review is limited to a determination of whether or not that sound judicial discretion has been abused.
In order to justify the making of any award it must appear that there is a causal connection between the efforts of counsel and the benefits conferred by the litigation. Implied, of course, is that the litigation must have achieved some beneficial result. Aaron v. Parsons, supra. For this reason, we reject an argument seemingly made by plaintiffs' counsel that the stipulation of settlement removed all from the Vice-Chancellor's consideration but the amount. Such cannot be the result because a settlement agreement for the award of fees by a court should be based in large part upon benefit conferred by the petitioner's efforts.
Plaintiffs' counsel argue strenuously that the Vice-Chancellor abused his discretion because, they say, he based his decision solely upon the proposition that no fund had been created by the litigation. They argue that he ignored the fact that their efforts in these law suits resulted in payment, or prospective payment, to the preferred stockholders of upwards of $2,000,000.
We think, however, that undue emphasis has been placed by plaintiffs' counsel upon a statement made by the Vice-Chancellor at the hearing on the application for fees. Because of the argument, we quote the statement: "I have no doubt whatsoever but that no fund in the true sense of the word was created by this action, and that there is no conceivable basis for a fee on the order of this court in any substantial amount." The argument of plaintiffs' counsel lifts this sentence from its context. Throughout, from the Vice-Chancellor's remarks to counsel, it is quite clear that he had in mind the necessity of establishing a causal connection between the activities of the plaintiffs and the ultimate payment to the preferred stockholders. That this is so, becomes abundantly clear from the sentence immediately following the one quoted above: "I feel quite clearly that the dividends here paid or about to be paid would have been paid almost as quickly had this suit not been filed."
In our review, therefore, of the Vice-Chancellor's award, we think we are bound to accept the fact that his decision was made on the basis that this litigation produced nothing of any material benefit to the preferred stockholders which they would not have received otherwise. We, therefore, have examined the record to determine whether or not the Vice-Chancellor's conclusion in this respect was justified or was an abuse of his discretion.
There is in the record an affidavit of one of the defendants, president of Servel, which, if credited as we believe the Vice-Chancellor credited it, justifies his reduction in the amount of allowances requested.
From this affidavit, it appears that Servel throughout the entire span of time covered by the litigation and, indeed, prior to the commencement of the litigation, had been engaged in liquidating its non-profitable assets and in negotiations for the purchase of a new profitable business which would enable it to take advantage of its very large *192 tax carry-forward. The affidavit refers to the embarrassment caused these negotiations by the filing of No. 1071 at a time when the negotiations conducted by Servel for the purchase of the business of Burgess Battery Company were about to reach fruition.
The institution of No. 1071, according to Mr. Menzies' affidavit, chilled the prospect of consummating the negotiations and it was only when the agreement of settlement arranging for the dismissal of No. 1071 was entered into that the acquisition was consummated.
On the basis of this affidavit, which is substantiated by an affidavit of an officer of the Prudential Insurance Company, the owner of 10% of the outstanding preferred stock of Servel, the Vice-Chancellor, we think, could not have been said to have abused his discretion had he allowed no fees whatsoever since the conclusion would have been warranted that, far from being of assistance, the activities of the plaintiffs and their counsel had actually been obstructive.
The Vice-Chancellor found that at no time during the course of the litigation were the preferred stockholders in any danger of losing their investment or dividend arrearages, since Servel, at all times, had more than ample funds to pay in full the claims of the preferred stock. He further found that the decision of Servel's management to conserve its liquid assets for the acquisition of a new business was a justified exercise of business judgment, and that its decision not to pay the arrearages had not been so long drawn out as to warrant the conclusion that management was freezing the assets of Servel for the benefit of themselves and the common stockholders to the detriment of the preferred stockholders. This finding, in our opinion, would have justified the denial of any allowance. The Vice-Chancellor found, however, specifically, that the litigation brought by the plaintiffs and its dismissal had to some degree accelerated the actual payment of the preferred dividend arrearages, and he was of the opinion that to that slight extent plaintiffs' counsel had contributed something to the realization by the preferred stockholders of what was due them. To quote his words, "I will accordingly, on the basis of that slight speeding up, allow counsel for plaintiffs a fee of $2500."
On the record before us, we are of the opinion that there is no basis on which we could say, as a matter of law, that the Vice-Chancellor clearly abused his judicial discretion.
The order of the Vice-Chancellor is accordingly affirmed.